**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AUTOTRAKK, LLC | : | No. 4:16-CV-01981 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| AUTOMOTIVE LEASING | : | |
| SPECIALISTS, INC. t/a | : | |
| AMBASSADOR DEALER FUNDING, | : | |
| MICHAEL C. CAFFREY, and | : | |
| GEORGE STAUFFER, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**JULY 10, 2017**

This case presents nuanced legal questions about the extent to which process patents and trade secrets may coexist. It too requires the Court to consider which of an employer's reactions might be warranted and which might be overreach, when he believes that former employees have betrayed him. Those inquiries must also be cast in the light of procedural rules that demand fact pleading and judicial involvement in case management decisions. With that in mind, the pending motion to dismiss is granted in part and denied in part, so that inapplicable claims may be peeled back and others may garner the judicial focus they may merit.

## I.    BACKGROUND

Plaintiff AutoTrakk, LLC, is an automotive leasing company based in Montoursville, Lycoming County, Pennsylvania. AutoTrakk finances automobile purchases for customers with suboptimal credit.[1]

Defendants Michael C. Caffrey and George Stauffer are former AutoTrakk employees.[2] Mr. Caffrey served as President of AutoTrakk from September 1, 2010 until around December 2014.[3] Mr. Stauffer began working with AutoTrakk on May 30, 2003 and served as Vice President of Sales until April 15, 2016.[4] The pair allegedly misappropriated certain of AutoTrakk proprietary information for the benefit of one of its Lafayette, Louisiana based competitors, Ambassador Dealer Funding, both during and after their employment with AutoTrakk.[5]

While AutoTrakk employees, Mr. Caffrey and Mr. Stauffer signed forms acknowledging their receipt of AutoTrakk's Policy Manual, which notified employees of a duty not to disclose proprietary trade secrets or confidential information obtained during the course of employment.[6] Additionally, Mr. Stauffer signed a confidentiality agreement on September 10, 2015 in which he agreed not

---

[1]    Am. Compl., ¶¶ 1, 5; ECF No. 18, Ex. D.

[2]    Am. Compl. ¶¶ 6, 8.

[3]    *Id.* ¶¶ 15, 19.

[4]    *Id.* ¶¶ 14, 26.

[5]    *Id.* ¶¶ 18, 20.

[6]    *Id.* ¶¶ 13, 17.

to disclose any "information, knowledge, or data" obtained through his employment with AutoTrakk.[7]

Following his departure from AutoTrakk in December 2014, Mr. Caffrey began working as President and CEO of Ambassador by May 2015.[8] After joining Ambassador, Mr. Caffrey allegedly began sending emails to Mr. Stauffer that sought certain of AutoTrakk's information.[9] In one such correspondence, Mr. Caffrey apparently asked Mr. Stauffer to run a certain vehicle through AutoTrakk's computer systems so that he might verify the analyses he performed in connection with Ambassador's "growing automotive finance" business.[10] AutoTrakk contends that Mr. Stauffer provided Mr. Caffrey with a worksheet generated by AutoTrakk's program and sent AutoTrakk's 2016 "Program Overview" to Mr. Caffrey via email.[11]

In return for sharing that information, Mr. Caffrey is alleged to have "rewarded" Mr. Stauffer with a March 2016 offer of employment to join Ambassador.[12] Mr. Stauffer purportedly accepted that offer to serve as a Dealer Account Manager with Ambassador before tendering his resignation to AutoTrakk

---

[7]     *Id.* ¶ 18.

[8]     *Id.* ¶¶ 6, 15, 19-20.

[9]     *Id*. ¶ 22.

[10]    *Id*. ¶¶ 22-24.

[11]    *Id*. ¶ 24.

[12]    *Id*. ¶¶ 25.

on April 15, 2016.[13] Based on the content of the emails, AutoTrakk believes that both Mr. Caffrey and Mr. Stauffer retained proprietary information, including an underwriting manual, upon their respective departures from AutoTrakk.[14]

As to the particular misappropriation allegations, AutoTrakk suggests that its business utilizes a collection of trade secrets and confidential information, such as marketing strategies, operations processes, computer programs, valuation tables, and calculations, to maintain a competitive edge in the industry.[15] It also alleges that both Mr. Stauffer and Mr. Caffrey had access to these trade secrets and confidential information during their employment with AutoTrakk and later misappropriated them as part of the scheme recounted above.[16]

An interesting wrinkle in this case bears mentioning upfront: the extent to which the alleged misappropriated information was already publicly available. In fact, AutoTrakk's own website displayed customer lists and programming material, while an AutoTrakk patent, U.S. Patent No. 7,860,746 (the "746 Patent") largely revealed significant snapshots of AutoTrakk' business model.[17]

Shortly after Ambassador allegedly began soliciting business from AutoTrakk's customers, the Montoursville business initiated this lawsuit. The

---

[13]  *Id.* ¶¶ 25-26.

[14]  *Id.* ¶¶ 27-28.

[15]  *Id.* ¶ 12.

[16]  *Id.* ¶ 16.

[17]  ECF No. 18, Exs. A, C, D, E.

amended complaint contains the following causes of action: misappropriation of trade secrets, violation of the Computer Fraud and Abuse Act, breach of the fiduciary duty of loyalty, tortious interference with current and prospective business relationships, conversion, unfair competition, unjust enrichment, and civil conspiracy.[18] In response, Defendants brought this motion to dismiss all counts for failure to state a claim upon which relief can be granted.[19] That motion to dismiss is now granted in part and denied in part, consistent with the following discussion.

## II.    LAW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may file a motion to dismiss for "failure to state a claim upon which relief can be granted." Such a motion "tests the legal sufficiency of a pleading," and "streamlines litigation by dispensing with needless discovery and factfinding."[20] "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[21] This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[22]

---

[18]   *Id*. at 6-18.

[19]   ECF No. 18 at 1.

[20]   *In re Hydrogen Peroxide Litigation*, 552 F.3d 305, 316 n.15 (3d Cir. 2008) (Scirica, C.J.) (quoting *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) (Easterbrook, J.)); *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

[21]   *Neitzke*, 490 U.S. at 326 (citing *Hishon v. King & Spalding*, 467 U. S. 69, 73 (1984)).

[22]   *Neitzke*, 490 U.S. at 327.

Beginning in 2007, the Supreme Court of the United States initiated what some scholars have termed the Roberts Court's "civil procedure revival" by significantly tightening the standard that district courts must apply to 12(b)(6) motions.[23] In two landmark decisions, *Bell Atlantic Corporation v. Twombly* and *Ashcroft v. Iqbal* the Roberts Court "changed . . . the pleading landscape" by "signal[ing] to lower-court judges that the stricter approach some had been taking was appropriate under the Federal Rules."[24] More specifically, the Court in these two decisions "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard.[25]

Accordingly, after *Twombly* and *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[26] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[27] "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted

---

[23] *See* Howard M. Wasserman, *The Roberts Court and the Civil Procedure Revival*, 31 Rev. Litig. 313 (2012).

[24] 550 U.S. 544 (2007); 556 U.S. 662, 678 (2009); Wasserman, *supra*, at 319–20.

[25] *Iqbal*, 556 U.S. at 670 (citing *Conley v. Gibson*, 355 U.S. 41 (1957)) ("[a]cknowledging that *Twombly* retired the *Conley* no-set-of-facts test").

[26] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

[27] *Iqbal*, 556 U.S. at 678.

unlawfully."[28] Moreover, "[a]sking for plausible grounds . . . calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[29]

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[30] No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[31]

When disposing of a motion to dismiss, a court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]."[32] However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[33] "After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss."[34] "Threadbare recitals of

---

[28] *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (Jordan, J.) (internal quotations and citations omitted).

[29] *Twombly*, 550 U.S. at 556.

[30] *Iqbal*, 556 U.S. at 679.

[31] *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557 (internal quotations omitted)).

[32] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

[33] *Iqbal*, 556 U.S. at 678 (internal citations omitted).

[34] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.).

the elements of a cause of action, supported by mere conclusory statements, do not suffice."[35]

As a matter of procedure, the United States Court of Appeals for the Third Circuit has instructed that:

> Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[36]

## III. ANALYSIS

### A. AutoTrakk's Misappropriation Of Trade Secrets Counts (I and III) Are Dismissed Without Prejudice, Because Although Trade Secrets May Exist Beyond Associated Process Patents, AutoTrakk Has Failed To Plead Sufficient Facts Supporting Their Existence Here.

Plaintiff alleges in Counts I and III of its amended complaint that Defendants' conduct violated federal and state trade secret laws. Count I is premised upon 18 U.S.C. § 1836, while Count III is brought pursuant to 12 Pa. C.S. § 5301. Both claims are brought against all three named Defendants.

Federal and Pennsylvania law both define a trade secret as information (1) that "derives independent economic value, actual or potential, from not being

---

[35]  *Iqbal*, 556 U.S. at 678.

[36]  *Connelly*, 809 F.3d at 787 (internal quotations and citations omitted).

generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use"; and (2) that "the owner thereof has taken reasonable measures to keep such information secret."[37]

Plaintiff avers that the Defendants misappropriated various trade secrets including the AutoTrakk Program. Defendants contend that there can be no misappropriation of trade secrets because the information Ambassador allegedly took from AutoTrakk to create its own program was both publicly available and well-known in the industry.

    i.    **AutoTrakk's trade secret misappropriation claims may be defeated by publicly available information or general trade practices.**

There is little doubt that the Defendants have presented ample evidence that a substantial portion of AutoTrakk's customer lists, business model, and program information are publicly disclosed on AutoTrakk's website.[38] They also provide convincing citation to AutoTrakk's '764 patent and its lengthy prosecution history.[39] To top it off, counsel for Plaintiff conceded as much at oral argument:

---

[37] 18 U.S.C. § 1839(3); 12 Pa.C.S. § 5302.

[38] ECF No. 31 at 6.

[39] *Id.* ("[T]he PTO told Plaintiff that the above parameters were so well-known Official Notice was taken"); ECF No 22, at 8-9 ("[T]he '764 Patent describes… a leasing system… eligible models and vehicles… capitalized cost… how a reviewer would review a lease… how to calculate the residual value… the checklist used").

MR. PIERMATTEI:    Defense counsel has argued in this case hey, you have a patent, AutoTrakk. Because you have a patent, you cannot have a trade secret . . . . Of course, we agree with the concept, Your Honor, that if it's disclosed in the patent, or if it's disclosed otherwise, it can't seek trade secret protection. We don't disagree with that concept. [40]

This concession accords with the law. Trade secrets "must be an employer's actual secret and not comprise mere 'general trade practices.'"[41] Thus, any information disclosed on AutoTrakk's website with regards to customer lists, marketing strategies, and its business model cannot be trade secrets. "[I]deas in [a] published patent application therefore [are] not subject to reasonable efforts to maintain confidentiality."[42] Additionally, any aspect of the business model that can be identified or ascertained from the patent prosecution history in Exhibit B is within the public domain. Accordingly, as a general matter, the information publicly disclosed by AutoTrakk throughout its website and its patent, as well as the information commonly known and put to use in the industry, cannot constitute trade secrets.

The prosecution history strongly suggests that portions of AutoTrakk's business model are tried and true practices in the automotive financing industry. In

---

[40]   Tr. of May 31, 2017 Oral Arg., ECF No. 37, at 4:17–5:03.

[41]   *Iron Age Corp. v. Dvorak,* 880 A.2d 657, 664 (Pa. Super. Ct. 2005).

[42]   *Foster v. Pitney Bowes Corp.*, 549 F. App'x 982, 989 (Fed. Cir. 2013).

fact, the examiners listed "Official Notices" that clarified which claims in the patent were disqualified because they were well established in the industry. They also made comparisons to past patents to show that similar patented technologies already existed.[43] Further, the patent examiners cited to a New York Times article (denoted as the "Robyn" article in the patent history and referred to as the "Mel Farr" article by the parties at oral argument), which described a business model involving the leasing of cars on a weekly basis.[44] The Robyn article shows that "general trade practices" do exist among automotive leasing companies.

To the extent that AutoTrakk retains a pool of confidential information beyond what is available or ascertainable on its own website, it is not clearly presented in the amended complaint. This stark reality is one that AutoTrakk's pleading has not fully been able to overcome. AutoTrakk avers that it uses trade secrets in "marketing strategies, financial information, customer lists, operations processes, computer programs, program information, data sets, and various

---

[43]   *See* ECF No. 18, Ex. B, at 42 ("The Examiner took Official Notice that 'lease has a cost not greater than certain percentage of retail value is old and well established in the automobile leasing industry to assist the leasing company to select vehicle for its customer [sic].'"); *See also id.* at 249 ("Therefore, it would be prima facie obvious to one of ordinary skill in the art at the time the invention was made to add the value of the line of credit is substantially equal to an amount of business anticipated during a predetermined period feature to the method of Simon et al.").

[44]   Robyn Meredith, *Auto Dealer Has an Offer for Drivers With Bad Credit, but There's a Catch*, New York Times (Jun. 15, 2017, 10:30AM), http://www.nytimes.com/1999/08/30/us/auto-dealer-has-an-offer-for-drivers-with-bad-credit-but-there-s-a-catch.html.

valuation tables and calculations."[45] However, its open-ended style of pleading leaves the questions of which material was misappropriated—and how *precisely* that misappropriation was implemented—entirely up to the reader's imagination. Put another way, it is unclear from the amended complaint where the universe of trade secrets begins beyond general business practices or public information and how exactly they bestow independent economic value by virtue of their secrecy.

ii.     **AutoTrakk's patent does not preclude it from advancing trade secret claims as a matter of law, so long as the alleged material entailed secret advancements or refinements.**

Even in light of these publicly available documents and general trade practices, a central dispute between the parties is the extent to which trade secrets may nevertheless exist so long as they constitute post-patent or otherwise secret refinements. I now hold that such claims are cognizable.

"After a patent has issued, the information contained within it is ordinarily regarded as public and not subject to protection as a trade secret."[46] Specifications of a patent do not have to be disclosed but merely ascertainable from the asserted patent to become public knowledge.[47] Defense counsel points to equations for credit, checklists, and calculations for residual value present in the original patent

---

[45]     Am. Compl. ¶ 12.

[46]     *On-Line Tech., Inc. v. Bodenseewerk Perkin–Elmer*, 386 F.3d 1133, 1141 (Fed.Cir.2004).

[47]     *See Accent Packaging, Inc. v. Leggett & Platt, Inc*., 707 F.3d 1318, 1329 (Fed. Cir. 2013) ("As a matter of law, any specifications and tolerances disclosed in or ascertainable from the asserted patents became publicly available in October 2005')

to support its clients' contentions that AutoTrakk's trade secrets are publicly

disclosed and, as a matter of law, not entitled to legal protection. While the precise

information provided within or directly ascertainable from a patent cannot

constitute a trade secret, patent holders are not necessarily precluded from

cultivating trade secrets that go beyond the corpus of the patent or that refine the

patent's process in some proprietary way.

While AutoTrakk's counsel justifies "post-patent refinement" in its briefs by

citing cases from the Middle District of Tennessee and the Western District of

Michigan, far more useful for this Court today is a body of federal cases from

Pennsylvania and the Third Circuit that have seemed to evade both parties'

research.[48] As the Third Circuit has explained, "[a] trade secret may be no more

than a slight mechanical advance over common knowledge and practice in the

art."[49] In addition, "[a] trade secret may be based on publicly available information

. . . if it combines publicly available information in a new and secret way."[50]

Thus, the simple fact that AutoTrakk possesses a patent for its business does

not mean it cannot use its experiences to develop refinements to, or alternative

methods of, performing its services. Adoption of the contrary rule would be

illogical: penalizing inventors for safeguarding their property rights and

---

[48]   ECF No. 30 at 3.

[49]   *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir. 1985).

[50]   *Fishkin v. Susquehanna Partners, G.P.*, 563 F. Supp. 2d 547, 582 (E.D. Pa. 2008).

discouraging further advancements beyond what processes have already been protected.

Moreover, AutoTrakk may be on to something in contending that some trade secrets they possess are not within the realm of the '764 patent or its prosecution history. "In construing the claims of a patent, a court should consider the claim language, the specification, and, if offered, the prosecution history."[51] A careful reading of the various appeals of the patent's original rejections reveals that the patent's approval was granted by continuously narrowing its original scope to create a series of claims that all depend upon attaching a device to a motor vehicle.[52] In its decision affirming a rejection in part and reversing in part, the Board of Patent Appeals stated that "Claims 19 and 21 are directed to an *apparatus*, not a method."[53] By emphasizing the "*device* capable upon activation of rendering the vehicle operable" in Claim 19 and "including a *microprocessor*" in Claim 21, it appears that the apparatus itself permitted the patent claims to survive.[54] The Patent Office later approved Claim 19 (now Claim 1) as the only

---

[51] *Katz v. AT & T Corp.*, 63 F. Supp. 2d 583, 589 (E.D. Pa. 1999) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995)).

[52] *See* ECF No. 18, Ex. B at 46-52.

[53] *See id.* at 50 (emphasis added).

[54] *See id.* at 50, 303.

independent claim of the patent, seeming to base that approval upon the apparatus—the device attached to the vehicle.[55]

In light of the process for approval, the '764 patent itself appears to be a patent on the use of a device, not an all-encompassing patent covering every aspect of AutoTrakk's business. Neither does it appear that the patent prosecutor intended for the patent to cover all aspects of financing in particular. When presented with the line in Robyn that a customer "pays $75.96 a week to lease a light blue Ford Escort," the patent prosecutor stated that "the repayment terms, such as the weekly payments owed by the lessor" were not covered in the patent and therefore were not even subject to scrutiny under Robyn.[56] Therefore, AutoTrakk's specific repayment terms, among other facets, could feasibly constitute a trade secret if held confidential for the purposes of economic gain.

Unfortunately, the pleadings contained within AutoTrakk's amended complaint are wholly unclear as to what proprietary information beyond the corpus of the '764 Patent and generalized business practices it alleges were misappropriated. While counsel at oral argument seemed to emphasize the specific repayment terms "on a weekly basis, biweekly, monthly basis,"[57] the amended complaint vaguely describes "a program that is built on the foundation of

---

[55]   *See id.* 37.

[56]   *See id.* 63.

[57]   Tr. of May 31, 2017 Oral Arg., ECF No. 37, at 6:02.

AutoTrakk's proprietary trade secrets."[58] Discerning what that program is and if it expands upon or reaches beyond the corpus of the patent remains unanswered.

### iii. The AutoTrakk "Program," as pled, does not plausibly state a trade secrets claim.

Although I agree with AutoTrakk's legal contention that trade secrets may exist beyond the corpus of the patent, I also hold that the Plaintiff's amended complaint pleads insufficient factual material to determine whether such a trade secret plausibly existed here. It is not clear from the pleadings what the AutoTrakk "program" is, if it is a trade secret, and how Ambassador misappropriated it through the exchange of a single email.

The bulk of AutoTrakk's amended complaint focuses on the alleged similarities between the two companies' programs. In particular, Mr. Stauffer is alleged to have "sent Mr. Caffrey a copy of AutoTrakk's 2016 Program Overview."[59] AutoTrakk further contends that "Ambassador is . . . using a program that is built on a foundation of AutoTrakk's proprietary trade secrets and confidential information."[60]

Defense counsel shrewdly compares this same "program" from Exhibit C of Plaintiff's amended complaint with the disclosures in the '764 patent that pertain to

---

[58] Am. Compl. ¶ 29.

[59] *Id.* ¶ 24.

[60] *Id.* ¶ 29.

the methods of funding leases for credit challenged consumers.[61] Defense counsel

notes that many broad features AutoTrakk's program, such as references

requirements, pay stubs, proof of residence, and a valid driver's license, can easily

be found in the public patent document.

In addition to that shortcoming, upon further inspection of the more discrete

items, it appears many factors actually differ between AutoTrakk and

Ambassador's programs including: maximum lease terms, acquisition fees,

maximum PTI, as well as funding limits for various terms.[62] While there are

striking formatting similarities between the AutoTrakk and Ambassador programs

in Exhibit C, the differences between the components of the two programs does not

bring this claim to a sufficient level of plausibility.

AutoTrakk has also perhaps made a troubling equivocation responsible for

further complicating this matter. The term "program" may, in certain contexts, take

many different meanings. One might attend a daughter's middle school band

performance and receive a written *program* of the event. Alternatively, one may

particularly enjoy watching a certain television *program* on CBS. A business might

commemorate its key selling points to its customers in a physical or web-based

*program*. And, a computer *program* may, for example, run a 2014 Chevy Malibu

---

[61]   ECF No. 22 at 8-9.

[62]   Am. Compl., Ex. C.

with 65,000 miles for a customer with a credit score of 550 and generate a worksheet with approvals and payment plans.[63] Such a computer program could take into account numerous variables, factors, and algorithms generated through years of business experience that may or may not as a whole constitute a trade secret.

However, whether such a proprietary program exists at AutoTrakk, and in what form, it is not at all clear from the complaint. Indeed, whether Ambassador employs some technological "program" beyond its paper "program" remains unclear. To that end, it would also appear that Plaintiff did itself no favors by publicizing as Exhibit C to its amended complaint what its counsel later termed "true and correct copies of AutoTrakk's program."[64]

Returning to the key issue, Plaintiff's counsel challenged defense counsel at oral argument to show how the '764 patent answers the Chevy Malibu question posed above. A more fitting question for the motion to dismiss stage might be: where, beyond the patent, in Exhibit C, or elsewhere in the amended complaint has *AutoTrakk* plausibly pointed to a secret, proprietary method it would employ to answer the Chevy Malibu question? Plaintiff has not sufficiently met its burden through its pleadings. These factual shortcomings, when considered in light of

---

[63]    Tr. of May 31, 2017 Oral Arg., ECF No. 37, at 5:22-6:02.

[64]    Am. Compl. ¶ 29.

what the Court hopes is illuminating legal guidance, warrant an attempt at re-pleading. If nothing else, I believe that such a measure will properly narrow the scope of discovery going forward.

### iv. AutoTrakk may re-plead in an attempt to plausibly state a trade secrets claim.

Federal Rule of Civil Procedure 15 sets forth the mechanisms for amending a pleading prior to trial. Section 15(a)(1) applies to amendments as a matter of course. Section 15(a)(2), entitled "Other Amendments," explains that "[i]n all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

The Third Circuit has "previously discussed when a court may deny leave to amend under Rule 15(a)(2)."[65] In *Shane v. Faver*, for example, then Circuit Judge Samuel A. Alito, Jr. stated that "[a]mong the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility."[66] "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted."[67] "In assessing futility, the District

---

[65] *Holst v. Oxman*, 290 F. App'x 508, 510 (3d Cir. 2008).

[66] 213 F.3d 113, 115 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir.1997) (Alito, J.).

[67] *Shane*, 213 F.3d at 115.

Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)."[68]

"Moreover, substantial or undue prejudice to the non-moving party is a sufficient ground for denial of leave to amend."[69] "The issue of prejudice requires that we focus on the hardship to the defendants if the amendment were permitted."[70] "Specifically, we have considered whether allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts or new theories."[71]

"The decision to grant or deny leave to amend a complaint is committed to the sound discretion of the district court."[72] "Factors the trial court may appropriately consider in denying a motion to amend include undue delay, undue prejudice to the opposing party, and futility of amendment."[73] For instance, "if the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend."[74]

---

[68] *Id.*

[69] *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001).

[70] *Id.*

[71] *Id.*

[72] *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 518 (3d Cir. 1988).

[73] *Averbach v. Rival Mfg. Co.*, 879 F.2d 1196, 1203 (3d Cir. 1989) (quoting *Foman*, 371 U.S. at 182).

[74] *Ross v. Jolly*, 151 F.R.D. 562, 565 (E.D. Pa. 1993) (citing 6 Wright, Miller, & Kane, Federal Practice & Procedure: Civil 2d § 1487). *See also Vosgerichian v. Commodore Int'l Ltd.*, Civil

Because I have determined that subsequent amendment would not be futile and would clarify this litigation's scope, I will grant leave to amend as to certain of Plaintiff's claims. This is particularly true of Plaintiff's trade secrets claims as detailed herein, though it applies to certain of AutoTrakk's claims detailed more fully below. However, in my judgment, continuation of certain other claims also discussed below, including Plaintiff's Computer Fraud and abuse Act claim, would be futile and therefore do not warrant subsequent amendment.

If AutoTrakk has a formula that has been refined through business experiences with a secret advance over common knowledge, and if Mr. Stauffer sent it to Mr. Caffrey in this case, the trade secret claim might reach the requisite level of plausibility. Perhaps that secrecy is so important that Plaintiff's counsel strategically decided to omit from the record any potential computer program containing algorithms and variables AutoTrakk may use to calculate payment plans. In view of that concern, the Court is more than willing to allow repleading of the facts supporting this claim under seal.

Because Plaintiff's amended complaint fails to allege sufficient facts to state a plausible claim for misappropriation of trade secrets, Defendants' motion to dismiss is granted without prejudice as to Counts I and III. I also note that the survival or dismissal of Plaintiff's trade secret claims may impact the remaining

Action No. 92-CV-4867, 1998 WL 966026, at * 3 (E.D. Pa. Nov 6, 1998), *aff'd sub nom Vosgerichian v. Commodore Int'l*, 191 F.3d 446 (3d Cir. 1999).

state law claims by means of preemption. That matter will be addressed at a more appropriate juncture.

**B.    AutoTrakk's Violation Of The Computer Fraud And Abuse Act Count (II) Is Dismissed With Prejudice, Because It Fails As A Matter Of Law.**

Plaintiff seeks relief from certain of Mr. Stauffer's computer access in which he allegedly exceeded his authorization under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g) ("CFAA").[75] CFAA provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator."[76]

Of importance here, "loss" as defined by CFAA is "any reasonable cost to any victim, including the cost of responding to an offense…and any revenue lost, cost incurred… because of interruption of service."[77] AutoTrakk instead requests compensatory damages for lost profits and a permanent injunction prohibiting Mr. Stauffer and Ambassador from using the alleged information. While Plaintiff alleges losses in excess of $5,000 within a one-year period of time, they overlook the law governing losses and the CFAA.

Courts have held that lost revenue or expenses incurred due to the inoperability of a computer system is the kind of a "loss" redressable by the

---

[75]    Am. Compl. ¶ 11.

[76]    18 U.S.C. § 1030(g).

[77]    18 U.S.C. § 1030(e)(11).

CFAA.[78] To the contrary, however, "the dissemination of trade secrets does not qualify as a 'loss' under the CFAA."[79] For instance, in *Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*, the United States District Court for the Eastern District of Pennsylvania noted that a claim for "future lost revenue because of the dissemination of trade secrets was not [a] 'loss' under the CFAA."[80]

The statute covers revenue losses only to the extent that such losses result from an interruption of service—without an attendant interruption of service, there can be no cognizable losses for the Plaintiff here.[81] The amended complaint only speaks to Ambassador "continuing to use the improperly accessed information" and sought an injunction as well as "lost profits, as a consequence of Stauffer causing a loss to AutoTrakk."[82] Plaintiff has alleged no systems losses nor any form of service interruption to its customers based on the alleged actions of the Defendants. Accordingly, Ambassador's motion to dismiss Count II of the Plaintiff's amended complaint is granted with prejudice.

---

[78] *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 719 (E.D. Pa. 2014).

[79] *Id.*

[80] *Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*, No. CIV. 09-2751, 2010 WL 4224473, at *6 (E.D. Pa. Oct. 22, 2010). *See also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC.*, 428 F.3d 504, 509 (3d Cir 2005) (affirming rejection of CFAA claim premised upon "a one-line e-mail," because "under CFAA . . . more is required" than "mere access" plus "suspicion," and "without a showing of some taking, or use, of information, it is difficult to prove intent to defraud").

[81] *See Nexans Wires S.A. v. Sark-USA, Inc.*, 166 F. App'x 559, 562 (2d Cir. 2006) (holding expected profits of $10 million not losses under the CFAA with no interruption of service)

[82] Am. Compl. ¶¶ 52-53.

**C. Defendants' Motion Is Denied As To AutoTrakk's Breach Of Fiduciary Duty Of Loyalty Count (IV), Because Plaintiff Has Alleged Facts Plausibly Suggesting That Both Mr. Caffrey And Mr. Stauffer Acted Against The Interests Of Their Previous Employer.**

Pennsylvania recognizes both a duty of loyalty and a duty of care, which consist of "conducting the employer's business in the employer's best interest instead of one's own" and "conducting the employer's business attentively and responsibly."[83] An employee's duties require them to not directly compete with their employer and prohibit them from "taking action on behalf of, or otherwise assisting, the employer's competitors."[84] Of particular relevance to this case, these prohibitions include the duty not to "use property or confidential information of the employer for the employee's own purpose or those of a third party."[85]

Plaintiff advances a breach of loyalty claim against both Mr. Caffrey and Mr. Stauffer. The Restatement (Third) of Agency has been adopted in Pennsylvania, and while an employee "is entitled to make arrangements to compete," he "cannot properly use confidential information peculiar to his employer's business."[86] This established duty essentially prevents employees from aiding a competitor of their employer "throughout the duration of the agency

---

[83] *Colgate-Palmolive Co. v. Tandem Indus.*, 485 F. App'x 516, 518 (3d Cir. 2012).

[84] *Certainteed Ceilings Corp. v. Aiken*, No. CIV.A. 14-3925, 2015 WL 410029, at *10 (E.D. Pa. Jan. 29, 2015).

[85] *Id.*

[86] *PTSI, Inc. v. Haley*, 2013 PA Super 130, 71 A.3d 304, 308 (2013) (citing Restatement (2d) of Agency, § 393 comment e.).

relationship."[87] While Defendants contend Mr. Caffrey's duties to AutoTrakk ceased with his resignation, it is alleged that his actions before he resigned, such as retaining any confidential information for nefarious purposes, benefited himself at AutoTrakk's expense. Following that reasoning and based upon the allegations, Plaintiff has alleged sufficient facts plausibly suggesting that Mr. Caffrey could have breached his fiduciary duty of loyalty to AutoTrakk.

Plaintiff avers that a confidentiality agreement existed between AutoTrakk and Mr. Stauffer, but Mr. Stauffer disagrees.[88] This dispute seems tangential to the underlying tort alleged, as the existence of an agreement would support a contract claim, where its absence would give credence to a claim sounding in tort. For support, I cite Pennsylvania's "gist of the action" doctrine, which bars tort claims where a contract exists and the alleged breach was not "outside of the parties' contractual agreements."[89]

As such, the more that it seems a contractual relationship did not exist with Mr. Stauffer, the more that a tort claim seems to be the appropriate procedural vehicle here. "Continuation of the employment relationship is not sufficient

---

[87] *Certainteed Ceilings Corp. v. Aiken*, No. CIV.A. 14-3925, 2015 WL 410029, at *10 (E.D. Pa. Jan. 29, 2015) (internal quotations omitted) (citing *PNC Mortg. v. Superior Mortg. Corp.*, No. CIV.A. 09-5084, 2012 WL 628000, at *26 (E.D. Pa. Feb. 27, 2012)).

[88] *See* ECF No. 27 at 15; ECF No. 22 at 25; ECF No. 25 at 10.

[89] *Certainteed Ceilings Corp. v. Aiken*, No. CIV.A. 14-3925, 2015 WL 410029, at *10 (E.D. Pa. Jan. 29, 2015). *See also Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 (3d Cir. 2001).

consideration to support a restrictive covenant, even if the relationship had previously been terminable at the will of either party."[90] Mr. Stauffer's confidentiality agreement went far beyond a traditional memorialization and included an extension to Mr. Stauffer's "successors, heirs, assigns, and personal representatives;" as well as "consent to [an] order of an immediate injunction, without bond, from any court of competent jurisdiction…"[91] Such a sweeping agreement, unsupported by adequate consideration, is unlikely to be valid.

However, the justifications behind the confidentiality agreement certainly put Mr. Stauffer on notice of the confidential nature of his work. "[N]o duty of confidence will be inferred unless a recipient has notice of the confidential nature of the disclosure. Although no specific form of notice is required, the circumstances must indicate that the recipient knew or had reason to know that the disclosure was intended as confidential."[92]

Thus, Plaintiff's allegations of Mr. Stauffer sending information and assisting a competitor, Ambassador, are sufficient to plausibly suggest a breach of fiduciary duty to AutoTrakk. Based on the allegations in the amended complaint

---

[90] *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 40 F. Supp. 3d 437, 455 (E.D. Pa. 2014).

[91] Am. Compl., Ex. B.

[92] Restatement (Third) of Unfair Competition § 41 (1995).

and the reasoning set forth above, Defendants' motion to dismiss Count IV of the amended complaint is denied.

### D. AutoTrakk's Tortious Interference With Current And Prospective Business Relationships Count (V) Is Dismissed Without Prejudice, Because It Has Not Pled The Elements Necessary For A Plausible Case, But Has Indicated At Oral Argument That Customer Relationships May Have Been Impacted.

As Defendants note in their briefs, under Pennsylvania law, there are five elements to a claim of tortious interference with current or prospective business relationships.[93] In order to prevail on such a claim, a plaintiff must prove "(1) the existence of a contractual, or prospective contractual relation between itself and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent the prospective relation from occurring; (3) The absence of a privilege or justification on the part of the defendant; (4) the occasioning of actual legal damage as a result of the defendants' conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference of the defendant."[94]

Plaintiff fails to plead sufficient facts supporting the existence of these elements here. Although the amended complaint contains allegations that Ambassador has solicited business from AutoTrakk customers in general, no third-

---

[93] ECF No. 22 at 19.

[94] *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 530 (3d Cir. 1998).

party dealerships have been identified in the complaint, nor has there been any clarification on the relationships harmed or the continued nature of such interference.[95] Plaintiff's counsel mentioned at oral arguments that, while "it's not in the complaint, customers called" about Ambassador soliciting business from AutoTrakk dealerships, suggesting that this lack of factual matter may have been an oversight.[96]

Following the Supreme Court's ruling in *Iqbal*, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[97] Although information satisfying the *Iqbal* plausibility standard may exist, such averments are conspicuously absent from Plaintiff's amended complaint.

Plaintiff's advancement of tortious interference with current and prospective business relationships against all Defendants therefore does not plausibly state a claim as pled. Defendants' motion to dismiss Count V of the amended complaint is therefore granted without prejudice.

**E.    Defendants' Motion Is Denied As To AutoTrakk's Conversion Count (VI), Because AutoTrakk Has Alleged Facts Plausibly Suggesting That The Defendants Interfered With AutoTrakk's Property.**

---

[95]  Am. Compl. ¶ 29.

[96]  Tr. of May 31, 2017 Oral Arg., ECF No. 37, at 29:11-29:16.

[97]  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (internal quotations omitted)).

Under Pennsylvania law, "a conversion is the deprivation of another's right of property in, or use and possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification."[98] Current Pennsylvania jurisprudence follows that sketched out by the Superior Court of Pennsylvania in *Northcraft*, which established that the law of conversion's "expansion has stopped with the kind of intangible rights which are customarily merged in, or identified with some document."[99]

The spirit of the law of conversion appears to be based on an interference with physical property, thereby preventing the true owner from effectively exerting his or her dominion over it. Regardless of whether trade secrets exist here, it appears clear from the complaint that Plaintiff alleges interference with physical property, and information that is commonly merged into a document. Plaintiff alleges a stolen underwriting manual, as well as an email containing a worksheet and a "Program Overview."[100] Inferences due in their favor support their allegations, including the claimed similarities between Ambassador and

---

[98] *Cenna v. United States*, 402 F.2d 168, 170 (3d Cir. 1968) (citing *Gottesfeld v. Mechanics and Traders Insurance Co.*, 196 Pa.Super. 109, 115, 173 A.2d 763, 766 (1961).

[99] *Northcraft v. Edward C. Michener Assocs., Inc.*, 319 Pa. Super. 432, 441, 466 A.2d 620, 625 (1983)

[100] Am. Compl. ¶¶ 24, 27.

AutoTrakk's Program Overviews in Exhibit C—an item that has, of course, been merged into a document and printed for this Court.[101]

Defendants cite to *American Hearing Aid Associates v. GN Resound North America* in support of dismissal, contending that since the items of interest, the underwriting manual, worksheet, and Program Overview, are not trade secrets here, they cannot be converted.[102] While these items may, with sufficient future discovery, rise to the level of trade secrets, the reasoning in *American Hearing Aid Associates*, which disposed of a case on summary judgement, is largely inapplicable here. In particular, the conversion claim in that case relied solely on customer lists that were easily obtained by visiting the plaintiff's website.[103] That court reasoned that there could not be a case of conversion since the website was readily available to the public, and specifically, competitors.[104]

Unlike in *American Hearing Aid Associates*, and based on the allegations made by AutoTrakk, it appears that the only way for Ambassador to obtain the computer program information allegedly misappropriated was through Mr. Stauffer. That is a troubling allegation in this case that is difficult to overlook. As

---

[101] Am. Compl., Ex. C.

[102] ECF No. 27 at 18; *Am. Hearing Aid Assocs., Inc. v. GN Resound N. Am.*, 309 F. Supp. 2d 694, 706 (E.D. Pa. 2004).

[103] *See Am. Hearing Aid Assocs., Inc. v. GN Resound N. Am.*, 309 F. Supp. 2d 694, 706 (E.D. Pa. 2004).

[104] *See id.*

Defense counsel conceded at oral arguments, even if the trade secret claims were to fall, it does not imply that the state claims must fall as well.[105]

At the motion to dismiss stage, taking these inferences in the light most favorable to the Plaintiff, this Court finds the claim for conversion against Mr. Caffrey and Mr. Stauffer are sufficiently pled. Accordingly, Defendants' motion to dismiss Count VI of the Amended complaint is denied.

**F.    AutoTrakk's Unfair Competition Count (VII) Is Dismissed Without Prejudice, As AutoTrakk's Pleadings Do Not Plausibly Suggest That The Defendants Conduct Significantly Interfered With Its Business Operations Or Customer Relations In A Way That Had A Tangible Market Impact.**

AutoTrakk advances a claim of unfair competition against all Defendants based on the allegations previously mentioned. While Plaintiff's counsel implores this Court to generously apply comment g to §1(a) of the Restatement (Third) of Unfair Competition to the facts of this case, I hold that the amended complaint has not pled facts sufficient to advance a claim of unfair competition. Although recent jurisprudence as to the Pennsylvania state unfair competition claim has seemingly—and in my view, inadvisably—broadened this cause of action, allegations suggesting illicit forms of competition still are necessary to plead a plausible claim.

---

[105]  Tr. of May 31, 2017 Oral Arg., ECF No. 37, at 49:04-49:09.

In 1922, the Pennsylvania Supreme Court defined unfair competition as "anything done by a rival in the same business by imitation or otherwise designed or calculated to mislead the public in the belief that, in buying the product offered by him for sale, they were buying the product of another manufacturer."[106] The spirit of the law could originally be expressed as "the deception practiced in 'passing off' the goods of one for that of another."[107] Historical use of the tort therefore coincided with trademarks and action taken under the Lanham Act, as businesses with similar marks would allege unfair competition resulting from customer confusion over products.[108]

As the world of business continued to advance throughout the twentieth century, "[t]he development of more complex business relationships" brought rise to a complementary "broadening of the scope of unfair competition."[109] This broadened scope can be seen in Pennsylvania cases like *Pennsylvania State University v. University Orthopedics, Ltd.* where unfair competition was read to "encompass[] trademark infringement, but also include[] a broader range of unfair practices," thereby opening the door to the "misappropriation of the skill,

---

[106] *B.V.D. Co. v. Kaufmann & Baer Co.*, 272 Pa. 240, 116 A. 508, 508-09 (Pa.1922).

[107] *Volunteer Firemen's Ins. Servs., Inc. v. Fuller*, No. 1:12-CV-2016, 2012 WL 6681802, at *11 (M.D. Pa. Dec. 21, 2012) (citing *Pa. State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 870 (Pa.Super.Ct.1998)).

[108] *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986) ("Federal courts have long held that § 43(a) of the Lanham Act extends protection to unregistered trademarks…").

[109] 4 McCarthy on Trademarks and Unfair Competition § 25:1 (4th ed.).

expenditures, and labor of another."[110] In *University Orthopedics*, the court entertained an unfair competition case in which it found the generic term "university," when used in a business context by the defendants, to evidence the improper "passing off" of the plaintiff's products and services.[111] While the Superior Court added some breadth to the original unfair competition claim, the law nevertheless continued to hinge upon one party taking advantage of customer confusion through its business practices.

In *Synthes (U.S.A) v. Globus Medical, Inc*—a case which has since been widely-cited by federal courts in Pennsylvania since 2005—the Eastern District of Pennsylvania adopted a quite sweeping interpretation of the Restatement (Third) of Unfair Competition.[112] *Synthes* states, in pertinent part, that "Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information."[113] That statement of the law is much too broad and cursory.

---

[110] *Pennsylvania State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 867 (Pa. Super. Ct. 1998).

[111] *Id.*

[112] *See generally Synthes (U.S.A.) v. Globus Med., Inc*., No. CIV.A. 04-CV-1235, 2005 WL 2233441, at *8 (E.D. Pa. Sept. 14, 2005).

[113] *Id.*

To support this liberal definition, *Synthes* string cites to following authorities:

- *ID Security Systems Canada, Inc. v. Checkpoint Systems, Inc.*, a 2003 Eastern District of Pennsylvania opinion that questionably states "[a]lthough no Pennsylvania appellate court has formally recognized the common law tort of unfair competition;"[114]

- A 1965 Supreme Court of Pennsylvania case, *Albee Homes, Inc. v. Caddie Homes, Inc,* which rules—not explicitly under unfair competition—that inducing a competitor's employees to terminate and violate employment contracts was wrongful[115];

- A Supreme Court of Pennsylvania decision from 1957 that relies on the traditional approach: "[i]f the particular use in question is reasonably likely to produce confusion in the public mind;"[116] and

- *Goebel Brewing Co. v. Esslingers, Inc.* which also focused on whether "the plaintiff's trade name… create[d] confusion and thus facilitate[d] deception."[117]

---

[114] *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 688 (E.D. Pa. 2003).

[115] *Albee Homes, Inc. v. Caddie Homes, Inc.*, 207 A.2d 768, 773 (1965).

[116] *Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d 838, 848 (1957).

[117] *Goebel Brewing Co. v. Esslingers, Inc.*, 95 A.2d 523, 526 (1953).

*Synthes* uses these cases to support its adoption of Restatement (Third) of Unfair Competition § 1. Comment g (1995). However, this Court is not convinced that the cases put forth by *Synthes* justify such vast broadening of Pennsylvania's unfair competition doctrine.

In its generous expansion of unfair competition, *Synthes* states—without direct citation—that Pennsylvania courts have recognized unfair competition claims for patent rights infringement.[118] However, ten years prior to *Synthes*, the Eastern District of Pennsylvania held the exact opposite in *Atlantic Mutual Insurance Co. v. Brotech Corporation*, stating that "Pennsylvania law has also long recognized unfair competition as an action separate and independent from patent infringement."[119] It is highly compelling to this Court that the Third Circuit affirmed the ruling in *Atlantic Mutual*.[120] In light of such prior precedent, this Court remains highly suspicious of the post-*Synthes* unfair competition jurisprudence.

Eastern District of Pennsylvania cases following *Synthes* have further expanded upon its generous wording. In a 2012 case with the same plaintiff, *Synthes Inc. v. Emerge Medical Inc.*, that court held that tortious interference claims and conversion claims "can serve as a legal basis for the unfair competition

---

[118] *Id.*

[119] *Atl. Mut. Ins. Co. v. Brotech Corp.*, 857 F. Supp. 423, 428 (E.D. Pa. 1994).

[120] *Atl. Mut. Ins. Corp. v. Brotech Corp.*, 60 F.3d 813 (3d Cir. 1995).

claim" and that all that was required to maintain the unfair competition claim was evidence of any conduct outlined in *Synthes*.[121] I am not compelled to adopt such a broad interpretation that would find unfair competition where there is evidence of any form of tortious wrongdoing in a business sense. Certainly, that would render unfair competition claims duplicative and entirely redundant.

While the Third Circuit in *Granite State Insurance Co. v. Aamco Transmissions, Inc.* stated "it is not so easy to conclude that there is one narrow and clear category" that defines unfair competition, that appellate case nevertheless cites a source that goes to great lengths to describe what kind of activity might so qualify.[122] *Granite State* relies upon Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), which lists twenty-one possible definitions of "unfair methods of competition."[123] The listed definitions range from "(i) Passing off goods or services as those of another" to "(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."[124] While the UTPCPL is not the common law tort of unfair competition, *Granite State* contemplated that the UTPCPL "by its very title

---

[121] *Synthes, Inc. v. Emerge Med., Inc.*, No. CIV.A. 11-1566, 2012 WL 4205476, at *14 (E.D. Pa. Sept. 19, 2012).

[122] *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir. 1995).

[123] 73 P.S. § 201-2(4).

[124] *Id.*

demonstrates it encompasses more than acts of unfair competition."[125] Such a result as followed by our Court of Appeals would be rendered illogical and unattainable if the common law tort of unfair competition encompassed all tortious conduct related to business activity as suggested by *Synthes*.

Early decisions in Pennsylvania did contemplate forms of misappropriation falling under the umbrella of unfair competition claims. In *International News Service v. Associated Press*, for example, the Supreme Court found unfair competition when, "instead of selling its own goods as those of complainant, [the defendant] substitutes misappropriation in the place of misrepresentation, and sells complainant's goods as its own."[126] Although the 1918 decision in *International News Service* appeared to direct the law away from the "passing off" of goods, later decisions interpreted this concept as misrepresentation as well. The Supreme Court of Pennsylvania in *Dastar Corporation. v. Twentieth Century Fox Film Corporation* defined such actions as "reverse passing off" when a company "misrepresents someone else's goods or services as his own."[127] Nevertheless, while it is clear the Supreme Court of Pennsylvania has contemplated broader

---

[125] *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir. 1995).

[126] *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 242 (1918).

[127] *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003).

definitions of unfair competition, "the outer limits have yet to be identified by that court."[128]

The principle that seems apt to apply here was stated well by the Honorable Gustave Diamond in *USX Corporation v. Adriatic Insurance Company*: Unfair competition may not be construed as "a virtual catch-all for any form of wrongful business conduct."[129] In fact, comment g itself to § 1 of the Third Restatement of Unfair Competition itself explains that a "primary purpose" of that section is "the identification and redress of business practices that hinder rather than promote the efficient operation of the market." That same comment appeals at several junctures to the notion of "substantial inference" with another's business. Taken together, it is difficult to fathom the imposition of liability for alleged unfair competition where it cannot be discerned from the complaint that the offending company mobilized misappropriated information in a way that had a tangible market impact.

---

[128] *USX Corp. v. Adriatic Ins. Co.*, 99 F. Supp. 2d 593, 620 (W.D. Pa. 2000).

[129] *USX Corp. v. Adriatic Ins. Co.*, 99 F. Supp. 2d 593, 619–20 (W.D. Pa. 2000) (explaining that unfair competition "contextually is limited to claims designed to protect a business from another's misappropriation of its business organization or its expenditure of labor, skill or money, *i.e.,* injury to reputation, product, manner of doing business, identification and so forth"), *aff'd,* 345 F.3d 190 (3d Cir. 2003). Indeed, our Court of Appeals, albeit in the context of interpreting commercial insurance policies, has reemphasized that unfair competition may require something more than suggested by the post-*Synthes* jurisprudence. For example, in *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 748 (3d Cir. 1999), the court anchored its reasoning as to the potency of an unfair competition on whether the offending company "misappropriated methods of gaining customers" or "misappropriated information about the manufacture of . . . the resulting product"—the former iteration being the more clearly actionable one.

In my view, AutoTrakk has not pled a case that compels this Court to conclude that there is a plausible reason to believe there was evidence of unfair competition. As noted earlier, Plaintiff's counsel has referred to conversations with customers that are not present in the amended complaint that *may* help plausibly state an unfair competition claim in light of the foregoing discussion. Until that time, the Plaintiff's pleading for unfair competition against all Defendants is insufficient and Defendants' motion to dismiss Count VII of the amended complaint is granted without prejudice.

### G. Defendants' Motion Is Denied As To AutoTrakk's Unjust Enrichment Count (VIII), Because AutoTrakk Has Advanced Underlying Claims That Have Not Fallen.

Pennsylvania law supports two species of unjust enrichment claims: "(1) a quasi-contract theory of liability, in which case the unjust enrichment claim is brought as an alternative to a breach of contract claim; or (2) a theory based on unlawful or improper conduct established by an underlying claim, such as fraud, in which case the unjust enrichment claim is a companion to the underlying claim."[130] This case appears to be one of the latter, hinging upon other claims in the Plaintiff's amended complaint.

---

[130] *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 492 (E.D. Pa. 2016).

Pennsylvania has adopted the Restatement of Restitution for determining whether there is unjust enrichment.[131] The Restatement provides guidance that unjust enrichment can occur through conversion (§40), interference with a trade secret (§42), or through a fiduciary or confidential relation (§43).[132] Further, "an unjust enrichment claim may be pled as a companion… to a claim of unlawful or improper conduct as defined by law—e.g., a tort claim."[133] When based on an underlying claim, an unjust enrichment claim shall fall where the underlying claims are dismissed.[134]

Thus, it seems appropriate that where there are claims that survive this motion to dismiss, Count VIII should also survive. Defendants' motion to dismiss Count VIII of the Amended complaint is denied.

### H. AutoTrakk's Civil Conspiracy Count (IX) Is Dismissed With Prejudice Upon The Consent Of Both Parties, Because the Allegations Do Not Plausibly Suggest Malicious Motivation.

In order to prove a civil conspiracy, "it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means."[135] Any alleged civil conspiracy must be shown to

---

[131] *D.A. Hill Co. v. Clevetrust Realty Inv'rs*, 524 Pa. 425, 432, 573 A.2d 1005, 1009 (1990).

[132] Restatement (Third) of Restitution and Unjust Enrichment § 40, 42-43 (2011).

[133] *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 493 (E.D. Pa. 2016).

[134] *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 937 (3d Cir. 1999).

[135] *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 472 (1979).

have been motivated solely by malice—an intent to injure the plaintiff.[136] As noted in their Brief in Opposition to Dismiss, the Plaintiff concedes that the allegations include motivation for personal or business benefit and would not meet the pleading requirements for civil conspiracy.[137]

With the consent of both parties, Defendants' motion to dismiss is granted as to Count IX against all defendants with prejudice.

## IV.  CONCLUSION

Defendants' motion to dismiss is granted in part and denied in part in accordance with the foregoing reasoning.

An appropriate Order that memorializes these holdings and sets forth the procedure for amendment follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[136]  *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009).

[137]  ECF No. 25 at 13.